```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 06/30/2023
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

                Plaintiff/Respondent,

        - against -

JOSE MUNOZ,

                Defendant/Petitioner.

**12 Cr. 00031 (VM)**

**20 Civ. 8436 (VM)**

<u>**DECISION AND ORDER**</u>

**VICTOR MARRERO, United States District Judge.**

Defendant/Petitioner, Jose Munoz ("Munoz" a/k/a "Rico") moves, pro se, under 28 U.S.C. Section 2255 to vacate, set aside, or correct the 75-year sentence the Court imposed on November 4, 2016, upon his conviction by a jury of several drug-related crimes. (<u>See</u> Civ. Dkt. No. 1, Cr. Dkt. No. 1769; "Petition" or "Pet.," Civ. Dkt. No. 2.) Munoz asserts myriad grounds for relief under his Sixth Amendment right to effective counsel, the Fifth Amendment's safeguards against double jeopardy, and statutory interpretation. For the reasons stated herein, Munoz's Petition is **DENIED**, in part, and **GRANTED**, in part.

## I.   <u>BACKGROUND</u>

### A.   <u>EVIDENCE AT TRIAL</u>

Munoz was found guilty, after a jury trial, on December 11, 2014, and thereafter was sentenced to 75 years' imprisonment. The evidence the Government offered leading to

Munoz's conviction showed that he was a member of a drug trafficking conspiracy that operated between 2006 and 2012 in the Bronx, New York, and specifically in and around the Parkside Housing Projects and the Allerton Avenue Cooperatives (together, the "Parkside Area"). To maintain their territory, Munoz and his confederates used guns, violence, robberies, and the threat of violence to ward off rival dealers, especially those operating in the Pelham area of the Bronx, from conducting gang activities in the Parkside Area. The purpose was to protect their customer base, their drugs, and their profits. One instance of territorial gun violence is of particular importance here: Munoz's murder of Shameek Young, a Pelham-based narcotics dealer, on or about December 31, 2011.

      1.   <u>The Narcotics Conspiracy</u>

Starting in or around 2006, Munoz and codefendants sold crack cocaine in the Parkside Area, specifically in the Allerton Avenue Cooperatives ("Coops"). Munoz was identified as a "boss" in the Coops. Bosses provided drugs to dealers to be sold on the street. Over the course of six years, Munoz and his crew sold in excess of 280 grams of crack cocaine in the Parkside Area. Several witnesses testified to having sold drugs with Munoz, including in large amounts over 100 grams.

Munoz and the other Parkside Area bosses did not allow drug dealers from other crews to sell in the Parkside Area without permission, or a "pass," from Munoz or another boss. To prevent rival dealers from infiltrating the Parkside Area, Munoz and his associates possessed and used firearms. The Government offered specific firearm evidence at trial. Witnesses testified that Munoz carried a .40 caliber firearm that he obtained from another member of his crew, Yackeem McFarland. On various occasions, witnesses observed Munoz carrying the .40 caliber gun as well as another .44 caliber revolver.

### 2.   The Robberies

Munoz was not only a boss of his gang, but also an enforcer. At trial, the Government introduced evidence that Munoz and confederates would rob drug dealers attempting to sell in the Parkside Area without a pass. Specifically, the Government showed that Munoz robbed a dealer nicknamed "Sleepy" in or around 2010 with the help of co-conspirator, Justin Freytes. During the robbery, Munoz was armed with a gun. Munoz attacked Sleepy, causing him to bleed, robbed him of his drugs, and told Sleepy to never return.

### 3.   The Murder of Shameek Young

In 2011, a violent territorial dispute began brewing between the Parkside Area dealers and the Pelham Area dealers.

The two areas were separated by fewer than ten blocks. As described above, Pelham Area dealers were not allowed to sell in the Parkside Area without a pass from Munoz or another boss. Shameek Young ("Young"), who also went by "Boom," was a Pelham Area dealer.

In 2011, Young and another Pelham Area dealer, Jesse McCollum ("McCollum" a/k/a "Shoddy") were selling crack in the Parkside Area Coops. Young and McCollum did not have a pass to do so. Munoz did not like this. Witnesses testified that Munoz thought Pelham Area dealers were "getting too comfortable" selling in the Parkside Area and understood Munoz to mean that he wanted to use guns to chase them away. (See Tr. at 1423-45.) And Munoz did.

In late 2011 the simmering tension between the crews heightened. In or around November 2011, Munoz told two members of the Parkside Area crew to shoot at Young. After that, Young fired at Munoz in the Coops. Munoz was nearly shot in the head during that occasion. Stemming from that shooting, Munoz told a Parkside Area crew member, Joshua Yorro ("Yorro"), that he was going to kill Young. At another later point in time, at a neighborhood restaurant known as the "Chicken Spot," Munoz stated that he surreptitiously overheard McCollum discussing how Young was going to shoot Munoz.

The tension and violence reached a boiling point on December 31, 2011. Munoz and other co-conspirators, including Yorro, attended a New Year's Eve party in the Bronx. Yorro testified that, before leaving for the party, Munoz went to retrieve his .40 caliber gun to bring with him. As the evening progressed, Munoz and Yorro moved to stand in the hallway outside the party. Then, Pelham Area dealers arrived, including Young and McCollum. Based on Yorro's testimony and video surveillance from the building, Young and McCollum walked past Munoz and Yorro. Once they had passed, Munoz took the .40 caliber gun out of his pocket and started firing, shooting Young several times. The medical examiner found that Young had been shot once in the neck, three times in his torso, and once in his right leg. All five shots entered from the rear. McCollum had returned fire, hitting Munoz, non-fatally, several times. Ballistics identified that several of the casings found at the scene came from .40 caliber bullets, the same as Munoz's firearm. Young, who was not seen with a gun that night, was taken to the hospital where he was pronounced dead.

Munoz testified to possessing the .40 caliber gun, to carrying the gun to the party on December 31, 2011, and to using the gun to shoot and kill Young. Munoz maintained, however, that, generally, he was not part of the Parkside

Area narcotics conspiracy, despite admitting to selling drugs there. He also testified that he shot Young in self-defense, claiming that he feared for his life after seeing McCollum with a gun, that he believed Young also had a gun with him at the party, and that Pelham Area dealers were blocking the building's front door exits, leaving Munoz no escape route. He also stated that he had previously overheard McCollum's conversation at the Chicken Spot regarding Young's intent, causing him to fear for his safety. Munoz testified that, when the Pelham Area dealers arrived at the New Year's Eve party, he heard McCollum tell Young it was "lit" (i.e., that violence was inevitable) and then Munoz and McCollum drew their guns and shot at each other simultaneously. Munoz, however, could not explain how this story lined up with evidence that Young was shot in the back. And Munoz had previously offered a different account for how Young was shot, conceding that video evidence showed no one from the Pelham Area crew was blocking the exits, and that Munoz and McCollum did not exchange fire simultaneously. Said differently, the video evidence showed that Munoz shot first.

    4.   The Verdict

    The jury convicted Munoz of each count of the indictment for which he was charged. Specifically, the jury found Munoz guilty of:

- Count 1: drug trafficking conspiracy in violation of 21 U.S.C. Section 841(b);

- Count 2: using and carrying a firearm during and in relation to the drug trafficking crime charged in Count 1, in violation of 18 U.S.C. Section 924(c)(1)(A)(i) ("Section 924(c)" or "924(c)" or "subsection (c)");

- Count 9: the murder of Young through use of a firearm during and in relation to the drug trafficking crime charged in Count 1, in violation of 21 U.S.C. Section 848(e)(1)(A);

- Count 10: brandishing and discharging a firearm in relation to a crime of violence, specifically, the murder of Young charged in Count 9, in violation of 18 U.S.C. Section 924(c)(1)(A)(iii) and (c)(1)(C)(i);

- Count 11: the murder of Young through use of a firearm during and in relation to the drug trafficking crime charged in Count 1, in violation of 18 U.S.C. Section 924(j) ("Section 924(j)" or "924(j)" or "subsection (j)");

- Count 12: conspiracy to commit Hobbs Act Robberies, in violation of 18 U.S.C. Section 1951

- Count 13: substantive Hobbs Act Robberies, including the robbery of Sleepy, in violation of 18 U.S.C. Section 1951; and

- Count 14: using and brandishing a firearm in relation to a crime of violence, specifically the substantive Hobbs Act Robberies charged in Count 13, in violation of Section 924(c)(1)(A)(ii).

5. <u>Sentencing</u>

Munoz was sentenced on November 4, 2016 to a total of 75 years' imprisonment. The calculation of Munoz's sentence is complex. First, Munoz was sentenced concurrently on several of the Counts. For Count 1, Munoz was sentenced to 20 years' imprisonment. Those 20 years would run concurrent with the 20-year sentence for Count 9, for the murder of Young in relation to a drug trafficking crime. Munoz was also sentenced to 5 years for Counts 12 (Hobbs Act Robbery Conspiracy) and 13 (substantive Hobbs Act Robbery), which would also run concurrent with Counts 1 and 9. Thus, on Counts 1, 9, 12, and 13, Munoz was sentenced to a total of 20 years' imprisonment.

The remaining of Munoz's counts of conviction were imposed as running consecutive to all other counts. For Count 2, use of a firearm in connection with the drug trafficking crime charged in Count 1, Munoz was sentenced to the mandatory minimum of five years. That five years is statutorily required

to run consecutive to the 20 years' imprisonment on Counts 1, 9, 12, and 13. The Court merged Counts 10 and 11 as they were both related to Munoz's use of a firearm to murder Young. The Court imposed a sentence of 25 years' imprisonment on the merged Counts 10 and 11 and ran that sentence consecutive to all other counts.

Similarly, Munoz was sentenced to 25 years' imprisonment on Count 14 (brandishing a firearm in connection with Hobbs Act Robbery charged in Count 13) to run consecutive to all other counts. Munoz's conviction on Count 14 was his second conviction for a violation of Section 924(c). Under Section 924(c)(1)(C)(i),[1] because Munoz had been previously convicted of a Section 924(c) violation, the Court was required to impose the mandatory minimum 25-year sentence and to run that sentence consecutive to all other counts.[2]

In his sentencing submission and at sentencing, Munoz's counsel raised arguments regarding the effect of the overlapping firearms convictions. Specifically, Munoz argued that the Count 2 and Count 10 convictions should be

---

[1] Section 924(c)(1)(C)(i) provides that "[i]n the case of a violation of this subsection that occurs after a prior conviction under this subsection has become final, the person shall -- (i) be sentenced to a term of imprisonment of not less than 25 years."

[2] Count 2 represented Munoz's "prior" conviction for a 924(c) violation. As discussed in more detail below, the Court did not clarify at sentencing whether the 25-year consecutive sentence imposed on merged Counts 10 and 11 was derived from Section 924(c)(1)(C)(i)'s requirements.

"considered a 'single unit' as opposed to separate convictions." (See Cr. Dkt. No. 1281 at 10.) Citing the Second Circuit case, United States v. Wallace, Munoz argued that "the violations charged in [Count 2 and Count 10] are unauthorized multiple convictions for a single unit of prosecution because a defendant who commits two predicate offenses with a single use of a firearm may only be convicted of a single violation of § 924(c)." (Id. (quoting United States v. Wallace, 447 F.3d 184, 188 (2d Cir. 2006)).) Munoz then argued that once Count 2 and Count 10 are merged, they are also a lesser included offense of Count 11, such that sentencing Munoz on all three counts would subject Munoz to multiple punishments for the same crime in violation of the Fifth Amendment. (See id. at 11.)[3]

The Court considered and rejected Munoz's arguments at sentencing. As described above, the Court merged Counts 10 and 11, avoiding a multiplicity issue for the murder of Young by firearm. But the Court left separate the gun use and possession conviction and sentence on Count 2. In all, Munoz was sentenced to 75 years total: 20 years total on Counts 1, 9, 12, and 13; followed by 5 years on Count 2; followed by 25

---

[3] Munoz also argued that because Section 924(j) has no mandatory minimum nor does it require the sentence to be consecutive, Munoz should only be sentenced on Count 9 (20 years as concurrent with Count 1) and Count 14 (mandatory minimum of 7 years for brandishing a firearm) for a total of 27 years. (See Cr. Dkt. No. 1281 at 11.)

years on merged Counts 10 and 11; and finally followed by 25 years on Count 14.

B.   PROCEDURAL HISTORY

After Munoz was sentenced, he appealed to the Second Circuit. Munoz's arguments on appeal were grounded on evidentiary disputes. (Many of those same evidentiary issues entail the same ineffective assistance of counsel arguments Munoz raises here.) The Second Circuit first rejected Munoz's argument that several statements made by Yorro related to Munoz not wanting Yorro to cooperate with the Government were improperly admitted. See United States v. Munoz, 765 F. App'x 547, 549-50 (2d Cir. 2019). It also rejected Munoz's challenge to the admission of post-arrest death threats made by Munoz and that were introduced at trial to show Munoz's consciousness of guilt and rebut Munoz's theory that he acted in self-defense in killing Young. Id. at 550. Although calling it a "close case," the Second Circuit concluded that the rationale for the statements' introduction failed because the purpose was to show consciousness of guilt and the threats "bore no relation to the offenses for which [Munoz] was being tried." Id. at 551. In affirming this Court's judgment, the Second Circuit noted that the "evidence that Munoz intentionally killed Young . . . was so substantial that the

jury would have convicted him absent any error in the jury charge." Id. at 552.

In October 2020, Munoz brought the instant Petition under 28 U.S.C. Section 2255 to vacate, set aside, or correct his sentence. That same month, the Court determined that the Petition was not meritless and directed the Government to respond. (See Civ. Dkt. No. 4.) After obtaining an attorney-client privilege waiver (see Civ. Dkt. Nos. 14, 18), and after an almost two-years' delay, the Government filed its opposition to Munoz's Petition along with the Affirmation of Mark S. DeMarco ("DeMarco"), Munoz's trial counsel. (See "Opposition" or "Opp.," Cr. Dkt. No. 1810; "DeMarco Aff.," Cr. Dkt. No. 1810, Ex. A.) Then, after almost another year's delay due to Munoz's placement in the Special Housing Unit, Munoz filed his reply in support of his Petition. (See "Reply," Cr. Dkt. No. 1835, Civ. Dkt. No. 35.) Munoz raises three categories of grounds for relief: (1) several instances of ineffective assistance of counsel under the Sixth Amendment; (2) two multiplicity of punishment claims under the Fifth Amendment's Double Jeopardy Clause; and (3) a statutory argument related to the "except" clause of Section 924(c).[4]

---

[4] Munoz voluntarily waived several claims in his Reply, including ineffective assistance of counsel claims relating to (1) a jury instruction on Count 11; (2) a claim in connection with failing to rebut

## II.  **LEGAL STANDARD**

The Court notes that Munoz is a pro se litigant. As such, his submission must be held to "less stringent standards than formal pleadings drafted by lawyers." Ferran v. Town of Nassau, 11 F.3d 21, 22 (2d Cir. 1993) (internal citation omitted). The Court must construe Munoz's submissions "liberally and interpret them to raise the strongest arguments that they suggest." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation marks and citation omitted).

### A.  SECTION 2255 GENERALLY

To prevail on a Section 2255 motion, a movant must show that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255; see also United States v. Addonizio, 442 U.S. 178, 185 (1979). The Supreme Court has consistently held that "an error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which

---

evidence related to the robbery counts; and (3) counsel's failure to seek a bill of particulars. (See Reply at 38.) Munoz also voluntarily waived his argument for dismissal of Count 14 brought under United States v. Davis, 139 S. Ct. 2319 (2019). (Id.) The Court finds those claims are waived voluntarily and knowingly and thus does not address them.

inherently results in a complete miscarriage of justice.'" Addonizio, 442 U.S. at 185 (quoting Hill v. United States, 368 U.S. 424, 428 (1962)); Hardy v. United States, 878 F.2d 94, 97 (2d Cir. 1989). Indeed, "to obtain collateral relief [under Section 2255] a prisoner must clear a significantly higher hurdle than would exist on direct appeal." United States v. Frady, 456 U.S. 152, 166 (1982).

    B.   INEFFECTIVE ASSISTANCE OF COUNSEL

"In order to establish an ineffective assistance claim, a petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." Cardoza v. Rock, 731 F.3d 169, 178 (2d Cir. 2013). With respect to the performance prong, "counsel should be strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. To overcome that presumption, a defendant must show that counsel failed to act reasonably considering all the circumstances." Cullen v. Pinholster, 563 U.S. 170, 189 (2011) (internal quotation marks, brackets, and citations omitted). While courts should be deferential to defense counsel's strategic decisions, those decisions must be within "the wide range of reasonable professional assistance." Strickland v. United States, 466 U.S. 668, 689 (1984).

With respect to the prejudice prong, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Cullen, 563 U.S. at 189 (internal quotation marks omitted). This standard "requires a substantial, not just conceivable, likelihood of a different result." Id. (internal quotation marks omitted).

A petitioner's filing of a Section 2255 petition sometimes may require an evidentiary proceeding. A district court, however, may also summarily dismiss a petition if the petitioner fails to raise any "detailed and controverted issues of fact." Newfield v. United States, 565 F.2d 203, 207 (2d Cir. 1977). The Court must "determine[ ] whether, viewing the evidentiary proffers, where credible, and record in the light most favorable to the petitioner, the petitioner, who has the burden, may be able to establish at a hearing a *prima facie* case for relief." Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009). But the court "need not assume the credibility of factual assertions, as it would in civil cases, where the assertions are contradicted by the record in the underlying proceeding." Id. In other words, if the court is persuaded that the petitioner has failed to establish a *prima facie* case for relief, it may summarily dismiss the petition.

### III. <u>DISCUSSION</u>

A.   <u>THE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS</u>

Munoz raises myriad ineffective assistance of counsel claims. Those claims are that counsel was ineffective by: (1) advising Munoz to concede on cross-examination that he had an issue with people who cooperated with the Government against him; (2) failing to request a limiting instruction regarding the "death threat" evidence; (3) failing to request a limiting instruction regarding evidence of Munoz's prior incarceration; (4) failing to request a limiting instruction regarding Munoz's gang affiliation; (5) failing to request a limiting instruction regarding evidence of selling drugs to an undercover agent; (6) failing to object to prosecutorial misconduct during summation; (7) failing to elicit favorable evidence, namely the testimony of Jose Nicole; (8) failing to investigate and call other favorable witnesses, including a woman named Raven, Raven's cousin, and Perry Lord, who were at the December 31, 2011 party where Young was killed; and (9) failing to raise a double jeopardy claim as to Counts 1 and 10.

Each of Munoz's ineffective assistance of counsel claims are meritless. The Court agrees with the Government that even if these decisions were outside the bounds of reasonable legal tactics (and they are not), none of them satisfy the prejudice

prong of <u>Strickland</u>. The evidence against Munoz was substantial and compelling. Even if DeMarco committed these technical errors, they do not rise to the level of prejudice Munoz must show. And that is true even if the Court considers them holistically as Munoz requests; he did not suffer death by a thousand cuts. Indeed, many of the grounds that Munoz raises were considered and addressed by the Court at trial and were not found, on direct appeal to the Second Circuit, to have resulted in prejudice to Munoz. An evidentiary hearing is not necessary to resolve these issues as Munoz has not made a *prima facie* case warranting the relief he seeks. The Court therefore denies Munoz's Petition on these grounds and streamlines its discussion.

### 1.   Testimony Regarding Cooperators

Munoz claims counsel was ineffective by advising him to testify truthfully on cross-examination that he had a "problem" with and wanted to hurt those who cooperated with the Government against him. Counsel's goal was to close the door to the Government impeaching or eliciting testimony on Munoz's criminal history and his physical attacks on cooperators while in pre-trial detention. Munoz argues that the Government could not have used the extrinsic evidence of the attacks to impeach Munoz if he lied about wanting to hurt cooperators.

The Court finds that counsel's strategy was sound strategic advice. Federal Rule of Evidence 608 ("Rule 608") directly contradicts Munoz's position. Under Rule 608, while "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness . . . the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness." Fed. R. Evid. 608(b). Questioning Munoz about these attacks would have been well within the bounds of Rule 608 had Munoz not truthfully testified about his feelings. This ground for relief is denied.

2.   Death Threat Evidence at Trial and Summation

Next, Munoz argues that counsel's failure to seek a limiting instruction regarding Munoz's death threats to cooperators during trial and at summation warrants relief.

Regardless of counsel's strategic decision to not request a limiting instruction to deemphasize the evidence to the jury, the Court finds that Munoz was not prejudiced. Indeed, the Second Circuit found that even if, generally, death-threat evidence may be prejudicial, in Munoz's case his "own testimony that he wanted to hurt cooperating witnesses" "lessened" any potential prejudice Munoz may have experienced. Munoz, 765 F. App'x at 551. Thus, Munoz fails to

"clear [the] significantly higher hurdle than [that which] exist[ed] on direct appeal." Frady, 456 U.S. at 166.

Munoz also argues that DeMarco was ineffective by failing to object, in summation, to the death-threat evidence, arguing that the Government "suggested to the jury that it could rely on the death-threat evidence as direct proof of the crimes charged." (Pet. at 22.) On Reply, Munoz points to the Second Circuit's ruling in United States v. Cummings, regarding Munoz's co-defendant, Armani Cummings. 858 F.3d at 775-76. There, the Second Circuit held that during the Government's summation, the same utterances at issue here (see Tr. 2162) created "an undue risk that the jury considered the death threat evidence as evidence of Cummings's murderous propensity rather than as evidence of Cummings's consciousness of guilt." Id.

Munoz's argument fails. The Second Circuit has already addressed the differences between Munoz and Cummings as part of Munoz's direct appeal and fully justified the different result reached as between Munoz and Cummings. Munoz, 765 F. App'x at 551. Munoz does not raise anything new here that warrants disturbing the Second Circuit's sound conclusion that Munoz was not prejudiced by admission of this evidence on summation.

### 3.   Past Incarceration, and Gang Affiliation Evidence

Munoz also argues that the erroneous admission of evidence of Munoz's past incarceration, and of Munoz's gang affiliation satisfies an ineffective assistance of counsel claim.

The Court also finds that DeMarco's decision not to seek a limiting instruction regarding Munoz's past incarceration was sound advice. As DeMarco explains in his affidavit, "evidence of [Munoz's] incarceration," which occurred between 2008 and 2010, "was probative of his claim that he was not a member of or involved in any way with the charged drug conspiracy since he was incarcerated in New York State and City prisons for all but 5 months of the charged conspiracy, which spanned a four-year period." (Opp. at 16 (quoting DeMarco Aff. ¶ 14).)

Finally, the Court finds that Munoz's argument related to gang affiliations is meritless. During pre-trial motion practice, the Court ordered that Munoz's "gang membership [was] relevant and admissible to enable the jury to understand the[] Defendants' relationship" but prohibited the Government and witnesses from mentioning that Munoz was specifically a member of the Bloods. See United States v. Cummings, 60 F. Supp. 3d 434, 439 (S.D.N.Y. 2014), rev'd in part on other

grounds, 858 F.3d 763 (2d Cir. 2017). Indeed, when, in the course of the multi-day trial, one witness used the phrase "Blood meeting" in passing reference to a gathering Munoz attended, DeMarco moved for a mistrial. The Court found that this small error did not constitute grounds for a mistrial, characterizing the testimony as "a slip-up" and that, in context of the full discussion, the jurors "would not necessarily say a Blood meeting means a meeting of the gang the Bloods." (Tr. 162, 176-78.) Agreeing with the Court's caveat, DeMarco determined not to seek a curative instruction to avoid highlighting the issue to the jury. (Id. 177-78.)

Insofar as Munoz argues that any reference to "gang" during the trial was prejudicial, the Court had already addressed this issue as part of the motions in limine and found that the proper balance was to limit only references to the Bloods. The Court finds that DeMarco's performance on these issues was not constitutionally defective.

### 4.   Sale to an Undercover Agent

Munoz contends that counsel was ineffective by failing to seek a limiting instruction to the jury that his sale to an undercover agent did not give rise to a conspiracy. The Government somewhat agrees with Munoz on this point; under the so-called "Buyer-Seller Rule" "while the illegal sale of narcotics is a substantive crime requiring agreement by two

or more persons, the sale agreement itself cannot be the conspiracy to distribute, for it has no separate criminal object." United States v. Hawkins, 547 F.3d 66, 71 (2d Cir. 2008) (internal quotation and alteration omitted). Thus, as a matter of law, Munoz is essentially correct, that, alone, Munoz's sale to an undercover agent would not be sufficient to establish his Count 1 conviction for drug trafficking conspiracy.

However, the buyer-seller rule is not the shield Munoz thinks it is here. The Second Circuit has long held that

> The rationale for holding a buyer and a seller not to be conspirators is that in the typical buy-sell scenario, which involves a casual sale of small quantities of drugs, there is no evidence that the parties were aware of, or agreed to participate in, a larger conspiracy . . . this rationale does not apply . . . where, for example, there is advanced planning among the co-conspirators to deal in wholesale quantities of drugs obviously not intended for personal use. Under such circumstances, the participants in the transaction may be presumed to know that they are part of a broader conspiracy.

United States v. Medina, 944 F.2d 60, 65-66 (2d Cir. 1991). At trial, the Government adduced more evidence of a drug conspiracy than merely Munoz's sale to an undercover agent. It elicited testimony that Munoz sold drugs with others on various occasions in large sums and was a boss within the Parkside Area drug trafficking crew, who distributed more than 280 grams of crack cocaine during the relevant period.

The buyer-seller rule does not apply to these circumstances. DeMarco's performance was not deficient for failing to seek such a limiting instruction.

### 5.   Eliciting Favorable Testimony and Calling Favorable Witnesses

First, Munoz argues that counsel was ineffective for failing to examine Jose Nicole ("Nicole") about the conversation Munoz overheard at the "Chicken Spot" about Young's desire to hurt Munoz. This claim is meritless. Munoz says that had Nicole been called to testify, he would have corroborated Munoz's testimony about the Chicken Spot conversation, bolstering the notion that Munoz feared Young would kill him. But Nicole was not, apparently, at the Chicken Spot. A review of the notes of Nicole's proffer establishes that Nicole did not have personal knowledge of the Chicken Spot incident but that he was told the story by someone else. (See Notes of Jose Nicole Proffer, Pet. Ex. D at ECF p.51 "[Illegible] told [Nicole] that one day [Munoz] was in the Chicken Spot + Shoddy + them were talking about him [i.e., Munoz] w/o knowing he was there.").) Any of Nicole's testimony corroborating Munoz's story would be inadmissible hearsay.

Munoz was also not prejudiced by DeMarco's failure to examine Nicole on this issue. The evidence adduced at trial clearly established that Munoz and Young were engaged in a

hostile and violent dispute over territory and that Young had already shot at Munoz. Munoz raised a self-defense claim based on his fear of Young following the first shooting, as supported by his own testimony about the Chicken Spot incident. Thus, Nicole's testimony would not only have been inadmissible but also cumulative. The jury found that Munoz did not act in self-defense, and there was ample evidence to support that conclusion.

Munoz's argument that DeMarco failed to call favorable witnesses, including "Raven's cousin," Lord Perry, and Trinea Sierra is also meritless. DeMarco had already found that these witnesses' testimony was "either irrelevant, inadmissible or incredible. . . . [and] all defenses were covered by Mr. Munoz in his trial testimony." (DeMarco Aff. ¶ 12.) The Court agrees with the Government that the testimony Munoz claims these witnesses would have given would not have moved the needle regarding Munoz's self-defense claim, given the mountain of evidence against Munoz regarding Young's death.

### 6. Dismissal of Counts 1 and 10 for Double Jeopardy

On Reply, Munoz clarifies that his claim here relates to DeMarco's performance at sentencing, arguing that DeMarco failed to argue that Munoz could not be sentenced separately on Counts 1 and 10. As the Court discusses below, there is a

double jeopardy issue in this case, but it is not the one Munoz points to here. The plain language of Section 924(c)(1)(A) makes clear that punishment for the firearm violation is "in addition to the punishment provided for such crime of violence or drug trafficking crime." The Government is correct that, to the extent Munoz takes issue with sentencing on Counts 1 and 9, courts have routinely found that Congress clearly intended that a conviction under 21 U.S.C. Section 848(e)(1) constitutes a separate offense from the predicate drug crime. See United States v. Mitchell, No. 02 Cr. 227A, 2005 WL 2476159, at *6 (W.D.N.Y. Oct. 6, 2005) (collecting cases). Even so, the Court avoided any possibility as to multiplicity of punishment as between Count 1 and Count 9 by running the 20-year sentences concurrently. And further, the Court merged the sentence imposed on Counts 10 and 11. Finally, DeMarco raised much more plausible Double Jeopardy Clause issues at sentencing, so Munoz's claim that he did not is meritless. (See Cr. Dkt. No. 1281 at 10-11.)

* * *

None of Munoz's ineffective assistance of counsel arguments establish *prima facie* grounds to warrant the relief he seeks. They are meritless. Accordingly, the Court dismisses Munoz's Petition on these grounds and denies Munoz's requested relief. The Court further finds that Munoz

25

has not satisfied the requisite standards for a certificate of appealability on his Sixth Amendment claims and declines to issue one. See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336 (2003).

    B.   THE SECTION 924 GROUNDS

Munoz also raises three additional grounds for relief, all related to his conviction for and sentencing on violations of various subsections of 18 U.S.C. Section 924. Two of those grounds relate to the Double Jeopardy Clause of the Fifth Amendment, while the third relates to an issue of statutory interpretation.

    1.   Procedural Default

The Government argues that each of these claims has been procedurally defaulted and thus the Court cannot, on a Section 2255 petition, review them. This position is based upon the bedrock principle that, to "protect the finality of federal criminal judgments," "a motion under § 2255 is not a substitute for an appeal." Rosario v. United States, 164 F.3d 729, 731 (2d Cir. 1999) (citations omitted). Thus, where criminal defendants fail to raise a claim on direct review, they are, generally, prohibited from raising it in a Section 2255 motion.

That obstacle is not unavoidable. Munoz can overcome the procedural default hurdle on these claims by showing "cause

for default and prejudice, or that a failure to consider the claim will result in miscarriage of justice, *i.e.*, the petitioner is actually innocent." <u>Sweet v. Bennett</u>, 353 F.3d 135, 141 (2d Cir. 2003). Although discussed in the context of collateral review of a state court conviction -- where "[p]rinciples of comity and federalism" permeate the analysis but which are not present here -- the Second Circuit has explained that there are "two categories of circumstances that may be properly labelled 'miscarriages of justice.'" <u>Washington v. James</u>, 996 F.2d 1442, 1450 (2d Cir. 1993). One of those categories is a "federal violation which challenges the validity of the trial itself," such as a violation of "the Double Jeopardy Clause." <u>Id.</u> The Second Circuit emphasized that "[j]ustice dictates that we act with greater leniency when determining whether to shut off a defendant's last avenue of hope" before "declin[ing] to reach the merits in a procedural default case." <u>Id.</u> Elsewhere, the Second Circuit has also indicated that the "miscarriage of justice exception may apply to sentencing enhancements." <u>Arend v. United States</u>, Nos. 17 Civ. 6018, 03 Cr. 6036, 2017 WL 2224132, at *2 (W.D.N.Y. May 22, 2017) (citing <u>Spence v. Superintendent, Great Meadow Corr. Facility</u>, 219 F.3d 162, 171 (2d Cir. 2000)).

Munoz advances two claims that are premised upon violations of the Double Jeopardy Clause. His third claim is based upon statutory interpretation of the "except clause" of 18 U.S.C. Section 924. None of these claims were raised on direct appellate review. The Court finds that Munoz's "except clause" claim is procedurally defaulted and does not fall within any of the exceptions noted above. The Court denies Munoz relief on that claim and declines to issue a certificate of appealability.

The Court also finds that, while Munoz's first Double Jeopardy Clause claim regarding Counts 9 and 11 may fall into the "miscarriage of justice" exception, it is meritless. The Count 9 conviction for violation of Section 846(e) contains an element (the weight of the drugs involved in the conspiracy) that is distinct from those needed to be proven in the Count 11 conviction for violation of Section 924(j). And the Section 924(j) conviction contains an element (the murder by use of a firearm) that is distinct from the elements needed to be proven under Section 846. Thus, the two Counts fail a straightforward application of the test set forth in Blockburger v. United States, 284 U.S. 299 (1932). See also United States v. Chacko, 169 F.3d 140, 145 (2d Cir. 1999) (no double jeopardy violation where "each charged offense contains an element not contained in the other charged

offense"). The Court thus denies Munoz's relief on this ground and declines to issue a certificate of appealability.

Munoz's final claim is that he suffered a double jeopardy violation by being sentenced on both Count 2 and Count 11. Counts 2 and 11 both relate to use of a firearm in relationship to the drug trafficking conspiracy charged in Count 1. Munoz was sentenced to the mandatory and consecutive 5-year minimum on Count 2, and 25 years on Count 11 (as merged with Count 10) which the Court ran consecutive to all other counts. The Court finds that reaching the merits of Munoz's final Double Jeopardy Clause claim is necessary to prevent a miscarriage of justice and so finds that review of this claim is not barred by procedural default.

2.   The Counts 2 And 11 Double Jeopardy Claim

Munoz submits that his Fifth Amendment right to not be placed in double jeopardy was violated when he was punished twice for the same crime in Counts 2 and 11. As described above, Munoz was sentenced to the 5 year mandatory minimum sentence to run consecutive to all other counts on Count 2, a violation of Section 924(c)(1)(A)(i), for possessing, using, and carrying a firearm during and in relation to a drug trafficking crime, namely that charged in Count 1. Munoz was also sentenced to 25 years on Count 11, a violation of Section 924(j), for murder through use of a firearm during

and in relation to a drug trafficking crime charged in Count 1. The Section 924(j) sentence, merged with Count 10, was imposed as running consecutively to all other counts. Munoz was thus sentenced to 30 total years running consecutive to all other counts as between Count 2 and Count 11.

> a)   The Blockburger Test

To determine whether Munoz's sentencing on both Counts 2 and 11 was multiplicitous, and thus a violation of the Double Jeopardy Clause, the Court first applies the Blockburger test. As noted above, the Blockburger test "examines whether each charged offense contains an element not contained in the other charged offense." Chacko, 169 F.3d at 145. A sentence suffers from a multiplicity issue when a defendant is punished for a single offense multiple times, "when, in law and fact, only one crime has been committed." Id. "If there is an element in each offense that is not contained in the other, they are not the same offense for purposes of double jeopardy, and they can both be prosecuted." Id. But, "[w]hen a defendant has violated two separate criminal statutes, the protection against double jeopardy is implicated . . . when one offense is a lesser included offense of the other." Aparicio v. Artuz, 269 F.3d 78, 96 (2d Cir. 2001).

The Second Circuit has never directly addressed whether it is a violation of the Double Jeopardy Clause to punish a criminal defendant for both a violation of Section 924(c) and Section 924(j) where both violations are based upon the same predicate offense, here the drug trafficking conspiracy charged in Count 1. The Government concedes that, on a "Blockburger analysis, the elements of a § 924(c) firearm possession charge are subsumed within a § 924(j) murder in furtherance of the same predicate offense." (Opp. at 32.) In other words, a 924(c) charge is a lesser included offense of 924(j).

This is correct. And it is, in fact, a somewhat toned-down position from that which the Government took before the Supreme Court in Lora v. United States, which was briefed, argued, and decided while Munoz's Petition was pending. See 599 U.S. ___ (2023). In Lora, the Government invoked the very double jeopardy principles that Munoz advances here, arguing that "'Section 924(j) amounts to the "same offense" as Section 924(c) for purposes of the Double Jeopardy Clause,' so 'a defendant may be punished for *either* a Section 924(c) offense *or* a Section 924(j) offense, *but not both*.'" 599 U.S. ___, slip op. at 7 (emphasis in original) (citing Brief for United States 22-26). The Supreme Court summarized the Government's position as being that a criminal defendant "cannot receive

31

both subsection (c) and subsection (j) sentences for *the same conduct.*" Id., slip op. at 8 (emphasis added). Although these issues were raised, the Supreme Court "express[ed] no position on the Government's view of double jeopardy," but found that, for the sake of argument, such a view was not in tension and could "easily be squared" with the Supreme Court's main holding.[5]

Here, the parties agree, and the Court finds it is correct, that a Section 924(c)(1)(A) violation is a lesser included offense of Section 924(j).[6] The plain language of

---

[5] The Supreme Court's holding in Lora resolved a circuit split and overturned the Second Circuit rule that 924(c)'s mandatory "consecutive-sentence mandate," was neither "incorporate[d]" nor "trigger[ed]" by Section 924(j), such that a sentencing court maintains discretion to sentence defendants convicted of Section 924(j) violations to either a concurrent *or* a consecutive sentence. Lora, 599 U.S. ___, slip op. at 8, 10.

[6] Not every violation of every subsection of 924(c) results in a multiplicity issue. As the Supreme Court signaled in Lora, reading the statute otherwise would result in tension between its subparts. Using the example the Supreme Court identified, the subsection of 924(c) addressing the use of a "machinegun or destructive device" or where the defendant is "equipped with a firearm silencer or firearm muffler," requires that such person convicted of that crime be sentenced to a mandatory minimum of 30 years. 18 U.S.C. § 924(c)(1)(B)(ii). The Supreme Court hypothesized that, were the same person also convicted of manslaughter under Section 924(j)(2) by use of, for example, a machinegun, the sentencing court would face the "impossible" task of fashioning a sentence that, per 18 U.S.C. § 1112, was "not more than 15 years," but was also, per § 924(c)(1)(B)(ii), "not less than 30." See Lora, 599 U.S. ___, slip op. at 6. It is possible to reconcile this conflict if the defendant is sentenced separately on both convictions. And that is possible because those subsections do not implicate a double jeopardy issue. Unlike violations of subsection 924(c)(1)(A), violations of subsection 924(c)(1)(B)(ii) require the Government to prove a distinct element -- the type of firearm, either a machinegun or destructive device, or the type of firearm attachment -- that does not need to be proven for either 924(c)(1)(A) or 924(j) violations. Thus, it would not appear to violate double jeopardy principles for a defendant to be punished under both subsections (c)(1)(B)(ii) and (j).

Section 924(j) confirms this. Section 924(j) requires that every element of a Section 924(c)(1)(A) violation must be proven plus the additional element relating to the murder. See 18 U.S.C. § 924(j) ("A person who, *in the course of a violation of subsection (c)*, causes the death of a person through the use of a firearm.") (emphasis added).

Thus, the critical question here is not whether, on a Blockburger analysis, there is a multiplicity issue as a matter of statutory interpretation of subsections 924(c) and (j) (and there is), but whether Munoz received "both subsection (c) and subsection (j) sentences for *the same conduct*." Lora, 599 U.S. ___, slip op. at 8.

b)   The "Unit of Prosecution" Analysis

The Court next must assess how to determine when criminal activity amounts to the same conduct. As with most things relating to Section 924, a "reasoned application . . . can be extremely difficult." United States v. Finley, 245 F.3d 199, 206 (2d Cir. 2001). The Government posits that Munoz's sentences on Counts 2 and 11 was proper, and not a violation of double jeopardy principles, because the convictions were not for the same conduct; in essence, Counts 2 and 11 constitute separate units of prosecution because "Munoz was sentenced for counts charging *different* conduct." (Opp. at 32.)

The Government bases this argument on its narrowly drafted indictment. The indictment expressly carves out from the Count 2 firearm charge the use of the firearm in connection to the murder of Young, which is Count 11. The indictment on Count 2 for which Munoz was convicted was drafted as follows: "From at least in or about 2006, up to and including in or about 2012, on occasions *other than* . . . the fatal shooting of Shameek Young . . . JOSE MUNOZ . . . during and in relation to a drug trafficking crime . . . namely, the narcotics conspiracy charged in Count One . . . knowingly did use and carry firearms." (Dkt. No. 966 ¶ 4 (emphasis added).) Thus, the indictment on Count 11 related only to the use of a firearm to murder Young "[o]n or about December 31, 2011," but was also perpetrated "during and in relation to a drug trafficking crime . . . namely, the narcotics conspiracy charged in Count One."[7] (Id. ¶ 13.) In other words, the Government argues that Munoz's continuous but passive possession and use of firearms from around 2006

---

[7] The full text of the indictment on Count 11 is "On or about December 31, 2011 in the Southern District of New York, JOSE MUNOZ, a/k/a/ 'Rico,' the defendant, willfully and knowingly, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, namely, the narcotics conspiracy charged in Count One of this Indictment, did use and carry a firearm, and, in furtherance of such crime, did possess a firearm, and did aid and abet the use, carrying, and possession of a firearm, and in the course of that crime did cause the death of a person through the use of a firearm, which killing is murder as defined in Title 18, United States Code, Section 1111(a), to wit, MUNOZ shot and killed Shameek Young, a/k/a 'Little Boom,' in the vicinity of 2366 Webster Avenue, in the Bronx, New York." (Dkt. No. 966 ¶ 13.)

to 2012 constitute different conduct from Munoz's use of the same firearm on or about a single day at the very end of that six-year period to murder Young, despite both charges being in relation to the predicate drug trafficking crime charged in Count 1.

The Government refers to Second Circuit cases discussing the separate unit of prosecution analysis as it relates to multiple Section 924(c) charges, as well as dicta from other opinions supposedly signaling the Second Circuit's view "that § 924(j) is not just a § 924(c) offense with a sentencing enhancement." (Opp. at 32.)

The Government relies on a line of cases originating with United States v. Lindsay, 985 F.2d 666 (2d Cir. 1993) in support of its "unit of prosecution" argument. In Lindsay, the defendant challenged multiple Section 924(c)(1) convictions for the use of "seven firearms during and in relation to the drug-trafficking offenses." Id. at 672. Lindsay argued that "where a defendant uses multiple firearms in relation to a drug-trafficking offense, he has committed only a single violation of § 924(c)(1), because congress did not intend to impose punishment for each firearm." Id. The Government had alleged that Lindsay "used" the seven firearms in relationship to a continuing criminal enterprise predicate

offense and a cocaine conspiracy predicate offense, resulting in 14 separate Section 924(c)(1) violations. Id. at 673.

Focusing on the word "use" as meaning "to put into action or service" and requiring that the firearm was used "during and in relation to" the underlying drug trafficking crime, the Second Circuit "conclude[d] that congress considered the appropriate unit of prosecution to be the underlying drug-trafficking offense, not the separate firearms." Id. at 673-74. The Second Circuit further elaborated that "[o]nly where the defendant commits multiple drug-trafficking crimes . . . and the government can link the firearms to those crimes, may the government prosecute for multiple violations of § 924(c)(1)." Id. at 674.

While Lindsay assessed the proper unit of prosecution where multiple guns were used in furtherance of a single predicate offense and applied the rule of lenity to avoid "turning a single transaction into multiple offenses," id. at 672-73, its progeny analyzed another variation: the continuous use and possession of a single firearm in furtherance of multiple predicate offenses.

In United States v. Finley, 245 F.3d 199 (2d Cir. 2001), the Second Circuit agreed with the "widely-shared view" that the text of Section 924 is "ambiguous" and thus "[t]he statute does not clearly manifest an intention to punish a defendant

twice for continuous possession of a firearm in furtherance of simultaneous predicate offenses consisting of virtually the same conduct." 245 F.3d at 207. Again referring to the rule of lenity, the Second Circuit found that because commission of the multiple predicate offenses was "simultaneous or nearly so, they consisted of virtually the same conduct with the same criminal motivation and one of them (possession of a drug with intent to distribute) was a continuing offense." Id.

Finley is factually distinct from the case here. In Finley, an undercover law enforcement agent approached the defendant to make a confirmatory drug buy, after which the remaining officers would execute a warrant. Id. at 201-02. Approximately three minutes after the drug sale, the officers forcibly entered the house where the drug buy occurred and discovered several smaller bags of drugs. Id. at 202. "[A]n unloaded sawed-off shotgun" was also found in the house where the drug sale occurred and where the remaining drugs were located. Id.

The Second Circuit concluded that the two predicate offenses, (1) distribution and (2) possession with intent to distribute, occurred nearly simultaneously and consisted of "virtually the same conduct." Id. at 207. Further, the Second Circuit noted that "Finley only chose to 'possess' the firearm

once, albeit in a continuing fashion" and that "at the moment
the sale occurred [], Finley had already committed both of
the predicate crimes." Id. Accordingly, the Second Circuit
held that Section 924(c) did not compel the "draconian" result
of allowing Finley to be charged with two separate Section
924(c) convictions, which, for the second, would have
required imposition of a "mandatory 25-year sentence." Id. at
208. Thus, under Finley, where multiple criminal transactions
are "inseparably intertwined," they constitute a single unit
of prosecution. Id.

The Government relies heavily on a footnote in Finley
that it argues should influence, if not control, the analysis
here. Responding to concerns from the dissent, the Second
Circuit in Finley noted that instances where a defendant "uses
a firearm to commit two murders while fleeing a crime scene"
or "uses a firearm to commit five murders in rapid succession"
are "readily distinguished from the present case both in terms
of the nature and timing of the predicate offenses and the
active employment of the firearm." Id. at 208 n.7. The
majority continued that "[t]hese multiple 'uses' of a firearm
would ostensibly not be charged under the possession language
of § 924(c)(1) and, in any event, have little in common with
the continuous and passive possession in this case." Id.

This footnote, the Government contends, makes clear that, unlike the case in Lindsay where the Government concedes "it makes good sense to think of the unit of prosecution as the underlying predicate offense for the § 924(c) charge," in cases involving both subsection (c) and (j) charges, the underlying predicate offense and the murder must constitute separate units of prosecution and thus can be both charged and punished separately. (Opp. at 34.) In such a way, here the Government says that Count 2 and Count 11 constitute separate units of prosecution because for 924(c) purposes, courts should apply Lindsay and Finley and assess the unit of prosecution based on the underlying predicate act or the temporal relationship of the underlying predicate acts and criminal motivation, but for 924(j) purposes, the unit of prosecution is the murder. (See Opp. at 35.)[8]

From that proposition, the Government argues that it would "defy logic" to find that a defendant could not be

---

[8] In another Lindsay-style case, United States v. Wallace, the Second Circuit held that a defendant could not be sentenced for multiple 924(c) convictions involving a drug distribution conspiracy and a drive-by shooting resulting in the death of an individual. 447 F.3d 184 (2d Cir. 2006). The defendant was charged with subsection (c) and (j) violations, subsumed within the same count, relating to the drug distribution count, as well as subsection (c) and (j) violations, again subsumed within the same count, relating to the crime of violence, i.e., the drive by shooting. Id. at 186. The Second Circuit did not address the issue here, that is the unit of prosecution analysis as between subsections (c) and (j), focusing only on "whether the two § 924(c)(1) counts . . . , were based on a single 'unit of prosecution.'" Id. at 187-88. It held that they were because "[t]he relevant conduct underlying the offenses predicating [the two counts] consists of the same shooting." Id. at 189.

sentenced to multiple Section 924(j) murders. Id. at 34. The Government points to the Seventh Circuit case, United States v. Curtis, 324 F.3d 501, 507-09 (7th Cir. 2003), where that court found no double jeopardy issue where multiple 924(j) violations were charged for distinct murders in connection with a single predicate offense. Id. (finding that "[a]pplication of basic double jeopardy analysis under the familiar test of Blockburger, shows that . . . each § 924(j) conviction required proof of a different element: in one instance the prosecution had to prove that the conspirators murdered [victim one], and in the other, it had to prove that they murdered [victim two]").

The Court is persuaded that the Curtis analysis is correct insofar as the defendants could be punished for committing multiple murders in relation to a single predicate offense. But that analysis does not have much bearing on the issues here. Munoz was not convicted of multiple murders. And the conclusion that the murders were the proper unit of prosecution in Curtis does not reveal the proper mode of analysis for assessing the issues here.

To the extent that the Government purports to endorse application of the "unit of prosecution" reasoning from Lindsay or Finley to assess violations of Sections 924(c) and 924(j) for the same underlying predicate offense, it does so

40

in only a limited fashion. Both the Government and the Second Circuit have seemingly distanced themselves from such an analysis wholesale. The Government argues that the meaning of footnote 7 in Finley is that the Second Circuit "would not use the same 'unit of prosecution' analysis for a § 924(j) murder as it would for § 924(c) possession." (Opp. at 34.)

That view on the use of the "unit of prosecution" analysis was somewhat confirmed by the Second Circuit in United States v. Medina, where the court made passing reference to how "[m]uch of the Lindsay court's reasoning applies only to defendants charged with multiple Section 924(c) offenses." 642 F. App'x 59, 61 (2d Cir. 2016). The Second Circuit, however, did not foreclose such an analysis. It noted that "even assuming that the Lindsay court's reasoning extends to a case, like Medina's, that involves the charging and prosecution of one Section 924(c) violation and one Section 924(j) violation" that the 924(c) charge need not be dismissed before trial. Id. The Second Circuit reached that conclusion because Lindsay dealt only with "draconian punishments 'that congress may never have contemplated'" but that such issues were "absent" in Medina. Id. (quoting Lindsay, 985 F.2d at 673). Much like Munoz, the defendant in Medina was charged with "one Section 924(c) offense and one Section 924(j) offense." Id. However, unlike Munoz, the

41

defendant in Medina was acquitted of the 924(j) charge after trial. See id.; see also Medina v. United States, No. 13 Cr. 272, 2019 WL 10890194, at *2 (S.D.N.Y. Apr. 24, 2019), report and recommendation adopted, No. 13 Cr. 272, 2020 WL 6140540 (S.D.N.Y. Oct. 18, 2020) (noting defendant's acquittal of the Section 924(j) count).

Thus, with Medina leaving the question open, the Second Circuit has not articulated any clear guidance on whether and how to apply a "unit of prosecution" analysis to 924(c) and 924(j) charges related to the same predicate offense.

The Government also relies on dicta from other Second Circuit cases to indicate that 924(j) charges can be sentenced separately. The Government cites United States v. Young, where the Second Circuit signaled that "§ 924(j)'s authorization of the death penalty and life imprisonment likely indicates that it is a stand-alone offense." 561 F. App'x 85, 94 (2d Cir. 2014). But to the extent that this selective quotation of the Second Circuit's view in Young means anything, it is clear that it is directed at a prosecutor's charging decision and what must be proven at trial. See id. (elaborating that Section 924(j) "is a stand-alone offense whose elements must be found by a jury beyond a reasonable doubt"). And further, the dicta from Young on which the Government relies espoused the Second Circuit's

view that 924(j) "incorporates the penalty enhancements of § 924(c)." Id. But that view has now been explicitly rejected by the Supreme Court in Lora, 599 U.S. ___, slip op. at 10, undermining Young's already limited persuasiveness.

The other cases on which the Government relies also discuss the interplay between Sections 924(c) and (j) in terms of charging documents. (See Opp. at 33 (first citing United States v. Barnes, 560 F. App'x 36, 42-43 (2d Cir. 2014) (taking no issue with including 924(c) and 924(j) counts in an indictment), then citing United States v. Christian --- F. Supp. 3d ---, 2021 WL 1110565, at *10 (S.D.N.Y. Mar. 23, 2021) ("Given the Second Circuit's suggestion that § 924(j) defines a distinct offense, and that it requires proof of at least one element that the § 924(c) count does not, namely the murder of an individual in connection with a crime of violence, the inclusion of both statutes in the same indictment does not violate the Blockburger test." (emphasis added))).)

The Court agrees with the Government insofar as it may be necessary and prudent for the Government to include 924(c) and 924(j) charges in an indictment related to the same underlying offense. Conceivably, and as seen in Medina, a defendant charged with both subsections may be convicted on one but not on the other. However, these charging decisions

and what must be proven at trial have little to do with the issue present here, which is whether a defendant, convicted of both a Section 924(c) and Section 924(j) violation based on the same underlying drug trafficking offense, can be punished twice.

c)    <u>Application</u>

In the light of the guidance regarding double jeopardy doctrine recently promulgated by the Supreme Court in <u>Lora</u>, and this Court's reading of <u>Lora</u>'s effect on Second Circuit jurisprudence articulated (though in somewhat ambiguous and inconclusive terms) in <u>Lindsay</u> and its progeny, including <u>Finley</u>, <u>Wallace</u>, and <u>Medina</u>, as well as on application of Sections 924(c) and 924(j), the Court concludes that Munoz has been improperly punished twice, in violation of the Double Jeopardy Clause of the Fifth Amendment, by being sentenced separately on Count 2 and Count 11.

As discussed in more detail below, the practical consequence on Munoz's sentence by vacating Count 2 may be immaterial. While the 5-year consecutive sentence will be vacated under Count 2, potentially reducing Munoz's sentence to 70 total years, at resentencing those 5 years may be added under Count 11, as subsection (j) allows courts discretion to impose "any" number of years.

The Government's contention that it can avoid a multiplicity claim by drafting the indictment to exclude from its Section 924(c) charge "gun possession in connection with the murder" makes little sense in context. (Opp. at 35.) While the murder, committed on one day amidst the six-year period of the underlying drug trafficking offense, represents more serious firearm use than every other day Munoz possessed the firearm, the Court finds that, even so, it all relates to the same, or virtually the same, conduct and same criminal intent. Cf. Wallace, 447 F.3d at 189 (finding criminal activity amounted to the same conduct where defendant "used the firearm first to further a drug trafficking crime, that is to maintain and support an extensive, ongoing crack cocaine distribution operation on Edgewood Street, and second to commit a drive-by shooting one day during the existence of the drug trafficking conspiracy").

To that end, the Court finds that adopting some of the logic from Lindsay, Finley, and like cases makes sense. The Government's conviction of Munoz on Count 2 related to Munoz's passive possession of at least two guns, a .40 caliber gun and a .44 caliber revolver, which were used during and in relation to the drug trafficking conspiracy to "protect [the crew's] drugs, proceeds, and territory." (Opp. at 5-6 (citing Tr. 139-41 463-65, 839, 1417-19).) The Government's

45

conviction of Munoz on Count 11 related to Munoz's use of the .40 caliber gun to kill Young in relation to the same drug trafficking scheme and for the purpose of stopping Young from selling drugs in Munoz's territory, i.e., the Parkside Area. (See Opp. at 7.) In essence, each and every possession and use of a gun by Munoz between 2006 and 2012 relates to the same underlying conduct, that is, furtherance of the drug trafficking conspiracy through protection of the crew's drug assets and territory. Accordingly, despite the temporal span involved, only one prolonged criminal transaction occurred, which essentially culminated in Munoz murdering Young.[9] Cf. Wallace, 447 F.3d at 189. Borrowing the language from Finley, Munoz "only chose to 'possess' the firearm once, albeit in a continuing fashion," from 2006 and then through and after the murder of Young on December 31, 2011. 245 F.3d at 207. And when Young was murdered, Munoz "had already committed [] the predicate crime[]," the drug trafficking offense. Id. Accordingly, Munoz's passive use and possession of the firearm is "inseparably intertwined" with Young's murder as

---

[9] Young's murder occurred on New Year's Eve, 2012 (i.e., December 31, 2011), and while Count 2 charges Munoz with use and possession of a firearm into 2012, which is the cut-off of the conspiracy (see Tr. 1104), no specific evidence was presented as to Munoz's activity in 2012 prior to his arrest on April 4, 2012. And the jury was instructed that it need not find that any event occurred in 2012. (See Tr. 2319.)

both inextricably relate to the underlying drug trafficking scheme. Id. at 208.

The language and structure of Section 924, when read in conjunction with the indictment, further highlight the problem with the Government attempting to carve out the specific use (the murder) from the passive uses. Under Section 924(j), the Government must show that Munoz "cause[d] the death of a person through the use of a firearm" "*in the course of a violation of subsection (c)*." Inclusion of the language, "in the course of" plainly indicates that a subsection (j) violation must refer to some simultaneous or nearly simultaneous violation of subsection (c). But the indictment charging Munoz with the Section 924(j) violation in Count 11 does not refer to or incorporate any of the separate subsection (c) violations charged, including that which was charged as occurring on December 31, 2011, i.e., Count 10. Likewise, the subsection (c) violation charged in Count 2 expressly disclaims the use and possession of a firearm on December 31, 2011 in relation to the murder of Young.

As noted, the Government did bring a subsection (c) charge in Count 10 for the discharge of a firearm on December 31, 2011, but that charge was in relation to the crime of violence in Count 9, whereas the Count 11 charge was in relationship to the overall drug trafficking conspiracy in

Count 1. Because Count 11 refers to Count 1, the subsection (c) violation that serves as the predicate for Count 11 must be that charged in Count 2. Further illustrating the overlapping relatedness of the conduct, the Court had no issue, although implicit in its sentence, concluding that the 924(c) and 924(j) violations in Counts 10 and 11, respectively, were essentially "for continuous possession of a firearm in furtherance of simultaneous predicate offenses consisting of virtually the same conduct," Finley, 245 F.3d at 207, and thus merged those sentences to avoid a multiplicity issue. The Court also recognized the relationship between Counts 1 and 9 (which otherwise include distinct elements and do not create a double jeopardy issue) and ran those sentences concurrently.

The drug trafficking conspiracy is pervasive and underlies each of Counts 1, 2, 9, 10, and 11. The Court is hard-pressed to understand why the Count 2 conduct must be punished separately.[10] The Government does not explain how the

---

[10] To further illustrate the problem, consider if the Government had brought a separate count under subsection (c) for Munoz's possession and use of a firearm, including discharging the firearm on December 31, 2011 in relationship to the drug trafficking conspiracy charged in Count 1, and excluding all other times. Now consider if the Government had been unable to prove that Munoz murdered Young and, as in Medina, Munoz was acquitted of the 924(j) Count. Under a straightforward Lindsay analysis, the two subsection (c) violations (the actual Count 2 brought and the hypothetical one assumed here) would continue to be based on a single underlying predicate offense, the drug trafficking charge in Count 1, which would serve as the proper unit of prosecution. It would be proper in such a circumstance to punish Munoz only once and only for discharging

statute "clearly manifest[s] an intention to punish a defendant twice for continuous possession of a firearm in furtherance of" one predicate offense and murder in furtherance of the same predicate offense, other than to warn that absurd results might follow. Id.

But the "absurd results" that the Government fears do not materialize under the Court's view. The Government asserts that if the 924(c) and (j) violations are "not distinct offenses," then "a § 924(c) conviction would immunize a defendant for any § 924(j) murders in furtherance of the same predicate offense." (Opp. at 35.) The Government's focus is backwards. In finding that Munoz should not be subject to multiple punishments under Counts 2 and 11, the Court's view is not that the Count 11 sentence should disappear, rather it is that Munoz should have been sentenced only under the flexible regime imposed by subsection (j). Essentially, where the violations are based on the same predicate offense, 924(j) swallows whole the strictures of

---

the firearm on December 31, 2011, a mandatory 10-year sentence, the most serious conduct under subsection 924(c). Due to ambiguity in the Government's indictment, this hypothesized violation of subsection (c) is implicit in the actual Count 11 brought by the Government. It defies logic to find that simply because Munoz's act of murder was successful that suddenly the unit of prosecution becomes entirely distinct. Rather, the better view, in accord with both the rule of lenity and the Supreme Court's view in Lora, is that when a murder is committed with a firearm in relation to a singular and continuous predicate offense, Congress did not intend to authorize multiple punishments, but rather to remove courts from the subsection (c) sentencing regime entirely and allow both more flexible and potentially harsher penalties.

924(c). That much is clear from the potential harshness of the penalties allowed under subsection (j) where, in the context of federal first-degree murder, a court may sentence a defendant to "death or by imprisonment for *any* term of years or for life." 18 U.S.C. § 924(j)(1) (emphasis added). Indeed, it makes little sense here why Munoz's sentence of five years on Count 2 must stand separately where it could be subsumed within that imposed by Count 11. This view accords with the hints left by the Supreme Court in <u>Lora</u>, including that "subsection (j) supplies its own comprehensive set of penalties that apply *instead* of subsection (c)'s." <u>Lora</u>, 599 U.S. ___, slip op. at 6 (emphasis added).[11] Accordingly, Munoz was sentenced for virtually the same conduct on Count 2 and Count 11, and the sentence under Count 2 must be vacated. Munoz should be resentenced accordingly.[12]

---

[11] Other hints include that "nothing in subsection (j) calls for [the] calisthenics" argued by the Government in jumping back and forth and applying both subsection (c) and (j)'s penalties. <u>Lora</u>, 599 U.S. ___, slip op. at 6.

[12] As far as the Court's research has revealed, the issue, along with the Court's conclusion here, represents one of first impression in a district court, and one on which the Second Circuit has not provided any clear guidance. And given its recentness, the Second Circuit's view is particularly unsettled post-<u>Lora</u>. Accordingly, Munoz should be appointed counsel under the Criminal Justice Act for purposes of resentencing, which the Court orders below. <u>See</u> 18 U.S.C. 3006A(a)(2)(B) ("Whenever the United States magistrate judge or the court determines that the interests of justice so require, representation may be provided for any financially eligible person who . . . is seeking relief under section . . . 2255 of title 28.") Further, to the extent that the Government may appeal the Court's grant of habeas relief to Munoz on this ground (<u>see</u> Fed. R. App. P. 22(b)(3)), and due to the complexity of the question presented, the Court recommends that Munoz "shall be represented . . . through appeal"

3.    The Effect on Munoz's Sentence

The Court's vacating Munoz's sentence on Count 2 creates a rippling effect. Because Munoz was convicted and sentenced on the Count 2 violation of subsection (c), it served as a "prior conviction" under Section 924(c)(1)(C)(i), such that Munoz was required to be sentenced to a mandatory and consecutive minimum of 25 years on at least Counts 10 and/or 14. Further muddying the water is Count 10's merging with Count 11 for purposes of sentencing. In imposing its sentence, the Court did not clarify whether the consecutive 25 years sentence on those Counts was based on the Court's discretion in assigning punishment for the murder of Young through use of a firearm, or if it was based upon the mandatory sentence for a subsequent conviction of a Section 924(c) violation. These issues must be addressed at Munoz's resentencing.

## IV.  ORDER

For the reasons stated above, it is hereby

**ORDERED** that the petition of Jose Munoz ("Munoz") to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. Section 2255 ("Petition," Civ. Dkt. No. 1; Cr. Dkt. No. 1769) is **DENIED**, in part, and **GRANTED**, in part. Munoz's claims for Sixth Amendment ineffective assistance of counsel,

---

by the appointed counsel. Taylor v. United States, 822 F.3d 84, 89 (2d Cir. 2016) (citing 18 U.S.C. § 3006A(c)).

Ground One of the Petition, are **DENIED**. Munoz's claim arising under the Double Jeopardy Clause of the Fifth Amendment, Ground Three of the Petition, relating to Counts 9 and 11 of the indictment S10 12 Cr. 31 is **DENIED**. And Munoz's claim under the "except" clause of 18 U.S.C. Section 924(c), Ground Four of the Petition, is **DENIED**. The Court declines to issue a certificate of appealability for these claims; and it is further

    **ORDERED** that no evidentiary hearing is required to resolve the remaining issues raised by Munoz's Petition; and it is further

    **ORDERED** that the claims voluntarily waived by Munoz (see Civ. Dkt. No. 35 at 38), including those under Grounds One and Two of the Petition, are **DENIED**. The Court declines to issue a certificate of appealability for these claims; and it is further

    **ORDERED** that Munoz's claim arising under the Double Jeopardy Clause of the Fifth Amendment, Ground Three of the Petition, relating to Counts 2 and 11 of the indictment S10 12 Cr. 31, is **GRANTED**. Munoz's sentence on Count 2 is vacated and Munoz shall be resentenced. Munoz shall be appointed counsel in connection with his resentencing and for any appeal of this Order. The Court directs the Probation Department to prepare a supplemental Presentence Investigation Report in

connection with the resentencing. The Court sets as the control date for sentencing, September 22, 2023, at 2:00 p.m. The Clerk of the Court is respectfully directed to mail a copy of this Order to Munoz (United State Marshal Reg. No. 66788-054, USP Lee P.O. Box 305 Jonesville, VA 24263) and to terminate the motions pending at Civ. Dkt. Nos. 1 and 27 and Cr. Dkt. No. 1769.

**SO ORDERED.**

Dated:   30 June 2023
         New York, New York

_____
              Victor Marrero
                 U.S.D.J.